## Case No. 4,441.

### EMERSON v. HOWLAND et al.

[1 Mason, 45.][1]

Circuit Court, D. Massachusetts. May Term, 1816.

Mr. Aylwin, for plaintiff.
William Sullivan, for respondents.

[1] [Reported by William P. Mason, Esq.]

STORY, Circuit Justice. In future, where seamen are discharged in a foreign port, I shall decree against the owners the whole of the three months' wages authorized and required to be paid by the statute of the 28th of February, 1803 (chapter 62). The practice has heretofore been to allow only the two months' wages, which belong to the mariner. But the owner ought not to be in a better situation than if he had complied with the terms of the law; and it is the duty of the court to see, that it is enforced. The additional month's wages will not, however, be paid over to the mariner, but retained in the registry, for the use of the United States, —to be applied according to the regulations of the statute. See The Courtney, 1 Edw. Adm. 239. I shall take a little time to consider the present case.

Afterwards, during the term, the following opinion was delivered:

STORY, Circuit Justice (after stating the facts). Upon the evidence in this case, it is impossible to support the first point asserted in the argument at the bar, viz. that the slave actually deserted at Drontheim, and therefore has forfeited all title to wages. In the first place, the answer of the respondents admits the amount of the due bill to be wages yet due and unpaid to the plaintiff, and alleges an actual tender of this sum to the proctor of the plaintiff. This alone would be conclusive against the plea of desertion. It is also as clear from the evidence, that the slave behaved himself to the entire satisfaction of the master; for in the letter to his owner, he says, "Ned has behaved himself extraordinary well, while on board, and has discharged every duty with propriety." He adds, "I have had the misfortune to be taken by the Danes, and brought up to this place, and am under the necessity of discharging your servant Ned." And not the slightest hint of desertion is suggested in any part of the letter. In the next place, if Ned had previously deserted, (of which I see no reasonable evidence,) the captain's receiving him again into favor, and giving him a discharge, with an acknowledgment, that he was entitled to his wages, was a complete purging away of all the previous forfeitures incurred by the asserted desertion. In every view, in which this defence presents itself, it seems to be as disingenuous, and unsupported, as any, that could have been devised by the owners of the ship.

The next question is, as to the validity of the discharge of the slave at Drontheim. It is the settled rule of this court, that the capture of a neutral ship does not of itself dissolve the contract of mariners' wages. The utmost effect, that can be attributed to it, is, that it suspends the contract, which is revived or extinguished by the ultimate acquit-

tal or condemnation. The Saratoga [Case No. 12,355]. The seamen, therefore, are not bound to quit the ship immediately upon the capture, nor can the master compel them to receive a discharge. They have a right to remain by the ship until a sentence of condemnation or acquittal has passed, or all reasonable hope of recovery is gone. But if, with consent of the master, they leave the ship, they are not prejudiced in their rights; and their title to wages for the previous period of the voyage will be confirmed or destroyed, according to the event of the ultimate adjudication. And such would have been the principles applicable to the present case, if the discharged mariner had possessed a legal capacity to make, and dissolve, the contract for wages. His discharge would then have been a voluntary act, and binding upon him; and as the ship was restored, his title to full wages for the antecedent term of service would have been perfect. But such a legal capacity can in no respect be attributed to him. The contract for his wages was entered into by his owner in Virginia; and must, therefore, be construed with reference to the lex loci contractus. In Virginia slavery is expressly recognised; and the rights founded upon it are incorporated into the whole system of the laws of that state. The owner of the slave has the most complete and perfect property in him. The slave may be sold or devised, or may pass by descent, in the same manner as other inheritable estate. He has no civil rights or privileges. He is incapable of making or discharging a contract; and the perpetual right to his services belongs exclusively to his owner. It follows from these considerations, that the discharge of the slave at Drontheim, even with his own consent, was an unauthorized act, and in no respect binding upon the plaintiff. As the latter never assented to, or ratified it, it was, as to him, a tortious act, and draws after it all the consequences of an unjustifiable discharge.

The next point, which, in fact, constitutes the principal question in this cause, is, to what time wages are, in this case, to be allowed. The counsel for the plaintiff claims wages up to the time of filing the libel, or at least to the time of the arrival of the Ann Alexander in the United States in 1814. The counsel for the respondents on the other hand contends, that no wages under all the circumstances ought to be allowed after the time of the discharge at Drontheim. If a seaman is wrongfully discharged during a voyage, it is asserted to be a rule of the maritime law, that he is entitled to wages up to the successful termination of the voyage, deducting any wages he may in the mean time have earned in any other vessel. Abb. Shipp. pt. 4, c. 3. § 1, pp. 424. 425. But it may be doubted, if this position is not laid down in too broad and unqualified a manner. Cases may occur, in which the wages for the whole voyage may be a very inadequate compensation; as, for instance, where the seaman is dismissed in a remote part of the world, and has no opportunity to return until long after the voyage is completed.

On the other hand, if the voyage is a long one, and the seaman is dismissed at an intermediate port early in the voyage, and he immediately returns home, wages for the subsequent portion of the voyage, after his return, would be too great a compensation. In the one case the payment would exceed, and in the other fall short of, the damages sustained by the breach of the contract; whereas, by the general principles of the maritime law, as well as the common law, it ought, in both cases, to be equal to the real loss and injury to the party. By the rule of the civil law, if the party be prevented, without his default, from performing full services, he is still entitled to the stipulated hire for the whole period for which he contracted to serve. "Qui operas suaslocavit, totius temporis mercedem accipere debet; si per eum non stetit, quo minus operas praestat." Poth. Pand. de Loc. Conduct. art. 4, § 4, p. 845; 1 Dom. Civ. Law, B. 1, tit. 4, § 9, art. 6, p. 107. This rule is followed in the maritime codes of foreign nations. By the laws of Wisbuy (article 3), a mariner unlawfully dismissed during the voyage, is entitled to full wages up to the termination of the voyage; and in addition to this the Hanseatic and French ordinances allow him the expenses of returning to the country of his departure. Hanseat. Ord. art. 42; 1 Valin, Comm. lib. 3, tit. 4, art. 10, p. 705; Poth. Louage des Matelots, pp. 206, 207. And a similar rule seems applied, where the vessel is sold in a foreign country, by the Consolato del Mare, c. 148. There is much good sense and equity in these regulations; and perhaps if the point were entirely new, it might not be unfit to incorporate them into our maritime code. But our law seems to have adopted a different course. It gives the party compensation for the injury, which he has sustained, according to the circumstances of each particular case. The courts of common law usually sustain the claim in a special action on the case for damages for the illegal discharge. But the admiralty, (which in this respect is sometimes followed by the courts of common law,) does not hesitate to pronounce for compensation in a simple suit for wages. It is not, that the admiralty cannot sustain a suit for damages, but it deems it proper to award damages in the shape of wages.

Notwithstanding this diversity on the point, the rules adopted by both courts in estimating the damages are, or ought to be, the same. In some adjudged cases, indeed, wages up to the successful termination of the voyage have been allowed; in others, wages up to the return of the seaman to the country, where he was originally shipped, without reference to the termination of voyage. The Beaver, 3 C. Rob. Adm. 92; The Exeter, 2 C. Rob. Adm. 261; Hoyt v. Wildfire, 3 Johns. 518; Brooks v. Dorr, 2 Mass. 39;

Ward v. Ames, 9 Johns. 138; Sullivan v. Morgan, 11 Johns. 66; Rice v. The Polly & Kitty [Case No. 11,754]; Mahoon v. The Gloucester [Case No. 8,970]; Hart v. The Littlejohn [Case No. 6,153]. But these apparent contrarieties are easily reconcilable, when the circumstances of each case are carefully examined. In all the cases, a compensation is intended to be allowed, which shall be a complete indemnity for the illegal discharge, and this is ordinarily measured by the loss of time, and the expenses incurred by the party. It is presumed, that after his return home, or after the lapse of a reasonable time for that purpose, the seaman may, without loss, engage in the service of other persons; and where this happens to be the case, wages are allowed only until his return, although the voyage may not then have terminated. On the other hand, if the voyage has terminated before his return, or before a reasonable time for that purpose has elapsed, wages are allowed up to the time of his return, for otherwise he would be without any adequate indemnity. Cases, however, may occur, of such gross and harsh misbehaviour, or wanton injustice, as may require a more ample compensation than can arise from either rule. The doctrine, therefore, asserted in the learned treatise of Mr. Abbott (Abb. Shipp. pt. 4, c. 2, § 1, p. 424), is far from being universal in its application. The qualification, too, of the doctrine, by allowing a deduction of the intermediate earnings in another vessel, is not supported by any authority cited by him for the text.

So far as foreign writers speak on the subject, they uniformly allow full wages without any deduction. Laws of Wisbuy, art. 3; Laws of Oleron, art. 13; Kuricke, 707; 1 Valin, Comm. 705; Poth. Louage des Matelots, pp. 206, 207; Curia Phillippica, cited Peters R. 120. It is true, the civil law seems in a parallel case to have incorporated the like deduction. 1 Domat, B. 1, tit. 4, § 9, art. 6, p. 107; 3 Poth. Pand. 843, art. 4, § 4. But it may well be doubted, if sound policy, or equity, authorizes it. It is not always easy for a mariner, upon his return home, immediately to engage in other service; and to turn him ashore in a foreign country, without friends or protection, is an injury, which is hardly compensated by a mere remuneration for the loss of time. The French ordinance, with great propriety, allows a deduction of the wages earned in the homeward voyage, from the expenses allowed for the return; but never from the wages which would have become due by a completion of the voyage. 1 Valin, Comm. 706, 719, art. 5; Poth. Louage des Matelots, note, 205, 207. If, therefore, this deduction of the intermediate earnings be not established by some authoritative decision, it will deserve consideration, whether it be not more consonant to sound policy and justice to disregard it; especially as the laws of the United States manifestly intend to discourage all discharges of our seamen in foreign countries. Perhaps, as a general rule, the provision of the French ordinance, in cases where the voyage is broken up by the act of the owner, or master, after its commencement, is as equitable as any that can be devised, in reference to the ordinary cases of the unjustifiable dismissal of seamen in foreign ports. It declares, that in such cases, the mariner shall receive wages, for the time he has served, and also for such farther time, as may be necessary for his return to the place of departure of the vessel, and also a reasonable allowance for the expenses of his return.[2]

In the case now in judgment, the principal ground upon which the claim for wages, up to the commencement of the suit, is attempted to be supported, is, that the slave has never returned to the possession of his owner, or to the United States. But this allegation is not satisfactorily made out in proof. On the contrary there does arise a strong presumption of his actual return to the United States; since he expressed a wish so to do; and he was actually shipped on board of a cartel, which afterwards safely arrived at New York. Under these circumstances the party, who seeks to avail himself of the asserted fact, that he has not returned, should be prepared to repel this presumption, and to show, that it was not the result of his own negligence or default. But if the proof of the fact were positive, there would be intrinsic difficulty in sustaining, in point of law, the claim of wages to the extent prayed for. Neither the master, nor owners of the ship, have guaranteed the return of the slave, or fraudulently prevented it. Every thing indeed seems to have been done to facilitate his return; and even the discharge itself does not appear to have been occasioned by any wanton violation of good faith. The utmost extent, therefore, to which, under these circumstances, the law ought to go, should be, to give the party compensation for the ordinary and necessary consequences of the act. It is not pretended, that the

---

[2] 1 Valin, Comm. lib. 3, tit. 4, art. 3, p. 686; Poth. Louage des Matelots, 203-205, note. There is a remarkable difference in the French ordinances between the case of the breaking up of the voyage by the act of the owner or master, and the discharge of a mariner without a valid cause. In the former case, wages are given, up to the time when the mariner has or might have returned home. In the latter case, the whole wages for the whole voyage are given. In both cases there is added the expense of his return. A corresponding difference is made in the present commercial code of France. In the case of a rupture of the voyage, seamen hired by the month, receive their stipulated wages for the time they have served, and in addition, as an indemnity, one half of their wages for the presumed duration of the remainder of the voyage, for which they were engaged, and the expenses of their return. In cases of a dismissal, without valid cause, they are to receive the whole of their wages, and their expenses of return. See Code de Commerce, lib. 2, tit. 5, arts. 257, 270, and Mr. Rodman's very valuable translation of it, pages 179, 183.

master or owner of the ship would have been responsible for the desertion of the slave during the voyage; and it is not easy to perceive, why they should be for any loss occasioned by his personal misconduct after his discharge.

It is clear, that a free mariner would have no. such right or remedy; and in the case of slavery, as to rights and remedies, the owner is substituted by the law in lieu of the slave. But if the present argument could prevail, the duties and responsibilities of the master and owners of a ship would, in the two cases, materially vary. No correspondent distinction has as yet been recognised, between common mariners, and servants shipped by their masters; and a slave is in this respect but a servant bound to perpetual servitude. His situation differs but little from that of the villein of feudal times. If there had been in the case at bar gross fraud, enticement, or oppression, there might have been some reason to have decreed the compensation by way of punishment; but in the absence of all these circumstances, it cannot be allowed.

The claim for wages up to the time of the arrival of the ship in Boston is not entitled to more favor; because it must be taken for true upon the evidence, that the slave actually returned, or might, but for his own default, have returned to the United States, a full year before that period. The utmost extent, to which wages can be allowed, is up to the 29th of March, 1813, the time of the arrival of the cartel, in which he embarked. It does not appear, that up to that time there was any reasonable delay in his endeavour to return to the United States; and as there were no additional expenses incurred. and no intermediate wages earned. the plaintiff upon the principles, which have been already stated. is fully entitled to this compensation. The decree of the district court must therefore be affirmed with costs.